The **MARCELLETTI & SON CONSTRUCTION CO., Inc.,** Plaintiff,

v.

**MILLCREEK TOWNSHIP SEWER AUTHORITY,** Defendant,

v.

**CONTINENTAL CASUALTY COMPANY,** Defendant on Counterclaim,

v.

**CONSOER, TOWNSEND AND ASSOCIATES,** Third-Party Defendants.

The **MARCELLETTI & SON CONSTRUCTION CO., Inc.,** Plaintiff,

v.

**CONSOER, TOWNSEND AND ASSOCIATES,** Third-Party Defendants.

Civ. A. No. 31–67 Erie,
Misc. No. 56 Erie (Execution).

United States District Court,
W. D. Pennsylvania.

May 21, 1970.

Irving O. Murphy, Erie, Pa., William D. Ginn, Joseph S. Ruggie, Jr., Cleveland, Ohio, for plaintiffs Marcelletti.

John J. Dailey, Erie, Pa., John R. McConnell, Philadelphia, Pa., for Millcreek Township Sewer Authority.

John G. Gent, Erie, Pa., for Continental Casualty Co.

John M. McLaughlin, Erie, Pa., for Consoer, Townsend and Associates.

Berkman, Ruslander, Pohl, Lieber & Engel, Pittsburgh, Pa., Charles I. Thompson, Jr., Philadelphia, Pa., McClure & Miller, Robert N. Spaeder, Erie, Pa., for intervenors.

## OPINION

GERALD J. WEBER, District Judge.

In this case arising out of a sewer construction contract and its termination plaintiff contractor recovered a verdict of $2,900,385.30 and $100,000 jointly against Defendants Millcreek Township Sewer Authority and Consoer, Townsend and Associates, and $254,367.04 against Defendant Millcreek Township Sewer Authority alone. The $254,367.04 represents moneys due plaintiff under the contract, most of which Defendant Authority admitted owing but which it withheld paying as credit against its counterclaim against plaintiff contractor and counterclaim defendant, Continental Casualty Company, the contractor's surety. The jury found against defendant Authority on its counterclaim and also on its cross-claim for indemnity against co-defendant Consoer, Townsend and Associates.

Motions for New Trial and Judgment N.O.V. were timely filed, and plaintiff began execution proceedings which were stayed without surety pending consideration of objections. Defendant Consoer-Townsend and Associates has posted a surety bond of $3,000,000 which has been accepted and approved. Defendant Authority has produced evidence that it is unable to secure a surety bond pending disposition of the motions or for appeal, but objects to execution for a number of reasons set forth below. The only funds of the Authority available,

except for a small uncontrolled administrative expense fund, are held by the Security-Peoples Trust Company, Trustee for the bondholders of the Authority, which has been summoned as garnishee in the execution proceedings. In addition, three banks holding substantial amounts of the bonds of the Authority have moved to intervene in the execution proceedings and have advanced objections to execution against funds in the hands of the Trustee.

Plaintiff now seeks to pursue execution against the Authority alone, and only to the extent of its $254,367.04 verdict against it alone. Plaintiff seeks execution only against funds held by said Trustee in the Bond Redemption and Improvement Fund, because under the Indenture these funds may be used for construction and other purposes at the discretion of the Authority, and are not subject to any superior lien of the bondholders.

We have considered the various objections to such execution advanced by the defendant Authority, its Trustee, and the intervening bondholders and do not find them sufficient to prevent execution against the Bond Redemption and Improvement Fund for moneys which have been determined due the Plaintiff under its construction contract.

Defendant Authority claims exemption from the requirement of a supersedeas bond pending disposition of post trial motions in this Court because it is a "municipal corporation" and the Act of May 19, 1897, [12 P.S. § 1152] provides exemption "when a county, township, or municipal corporation * * * is the appellant."

Is a municipal authority a "municipal corporation" in the sense of that statute? The statute was enacted long before the concept of a municipal authority was developed in Pennsylvania.

Municipal authorities have often been called "municipal corporations" by decisions of the appellate courts of Pennsylvania. But we must look at the decisions of those courts to determine the purpose of so holding.

In Emporium Area Joint School Authority v. Anundson Construction & Building Supply Company, 191 Pa.Super. 372, 156 A.2d 554 [1959], the court said that a school authority incorporated under the Municipal Authority Act of 1945 [53 P.S. § 301 et seq.] was a municipal corporation but the rationale of its decision was, quoting the lower court, "But regardless of whether the authority here is a municipal corporation we see no reason why the same rules of law which apply to municipal corporations should not apply to authorities." What was actually in issue here was certain claims of a contractor for extra work for which it had no written authorization. The Municipal Authorities Act had a provision, 53 P.S. § 312, requiring public bidding on contracts for construction in excess of $500. This is similar to the public bidding requirements of other municipal corporations. Because the authority was engaged in performance of the same public function as a school district, the court held that the authority was entitled to have the same public policy applied to its contract liability as is applied to municipal corporations.

In West View Borough Municipal Authority Tax Case, 175 Pa.Super. 641, 107 A.2d 130 [1954], the Court said that a municipal authority was a municipal corporation, but that has nothing to do with its decision. The Municipal Authorities Act, 53 P.S. § 318, provided that municipal authorities should not be required to pay taxes on property acquired *or* used by them for the purposes for which they were created. The Pennsylvania Constitution, art. 9, § 1 provided tax exemption for "public property used for public purposes." The Court applied the prior decisions arrived at in municipal corporation cases that the use must be an actual and present use and not one in contemplation to justify exemption from taxation.

In State College Borough Authority v. Pennsylvania P.U.C., 152 Pa.Super. 363, 31 A.2d 557, the Court held that a

municipal authority was subject to the same public utility commission rate regulations as municipal corporations because the Public Utility Law, Sec. 301 [66 P.S. § 1141] expressly included "any public corporation, authority, or body whatsoever created or organized under any law of this Commonwealth for the purpose of rendering any service similar to that of a public utility" under its definition of "municipal corporations" subject to such rate regulation.

In Southwest Delaware County Municipal Authority v. Aston Township, 413 Pa. 526, 198 A.2d 867 [1964], the Pennsylvania Supreme Court also said, "An authority is a municipal corporation, entitled to the same immunities, rights and powers of other municipal corporations and 'school authorities are created to perform some of the same functions which school districts are authorized to perform' and 'the same considerations of public policy should apply to an authority as to a school district.' " The holding was that the immunity from improvement assessments granted to school property was not affected by the fact that legal title to the property was in a school authority rather than the school district.

The appellate courts of Pennsylvania have not been indulging in gross conceptual jurisprudence, as defendant Authority urges, but in each case have looked at the purpose behind the rule to determine if the public policy is applicable as well to an authority.

"A municipal corporation is a legal institution formed by charter from sovereign power, erecting a populous community of prescribed area into a body politic and corporate with corporate name and continuous succession and for the purpose, and with the authority, of subordinate self-government and improvement and local administration of affairs of state." 62 C.J.S. Municipal Corporations § 1 [Black type headnote].

"The power of local government or self-government has been held to be the essential characteristic, or an essential attribute, or the distinctive purpose and distinguishing feature, of a true municipal corporation * * *." Idem. p. 61–62

"A municipal corporation engaged in the business of supplying public utilities and facilities is regarded as a public corporation transacting private business for hire, and, in that respect and to that extent, as a private or quasi-private corporation." Idem. p. 73 [Black type headnote]

This is the Pennsylvania view, even with respect to a true municipal corporation, such as a city. With respect to a city owned and operated water supply system, the Pennsylvania Supreme Court in Shirk v. City of Lancaster, 313 Pa. 158, 169 A. 557 [1933], held that although the defendant was a municipal corporation, the service of water supply was a proprietary activity of the city, and

"As to such powers, and to the property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded *quo ad hoc* as a private corporation, or at least not public in the sense that the power of the Legislature over it * * is omnipotent; * * *."

In Central Contracting Co. v. C. E. Youngdahl & Co., 418 Pa. 122, 209 A.2d 810 [1965], the Supreme Court of Pennsylvania clearly adopted a functional approach. The action had been started by foreign attachment of funds in the hands of a Housing Authority. The defense was raised that as a general rule of law the United States and their political subdivisions cannot be summoned as garnishees in any action without statutory authorization. The authority argued its position as a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof.

The Court stated that while it had previously recognized the public or governmental nature of the authority in other contexts, it saw no reason for the application of the "general rule" in this case because such authorities engage in

activities that have the aspects of large scale private commercial enterprises, and cited its prior decision in Haines'v. Lone Star Shipbuilding Co., 268 Pa. 92, 110 A. 788 [1920], and its citation therein from Judge Learned Hand in Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corp., D.C., 261 F. 716:

> "Moreover, it is in general highly desirable that, in entering upon industrial and commercial ventures, the governmental agencies used should, whenever it can fairly be drawn from the statutes, be subject to the same liabilities and to the same tribunals as other persons or corporations similarly employed."

The activities of a sewer authority have been repeatedly held proprietary.

> "We agree with the trial judge that under Pennsylvania law the construction of a sewer is a proprietary function and not a governmental function and that accordingly Township's claim of immunity must fail." Quinones v. Township of Upper Moreland, 293 F.2d 237 [3rd Cir., 1961].

This was a case controlled by Pennsylvania law under which a Township claimed governmental immunity from suit for the negligent acts of its employees.

In Berlanti & Son v. Borough of Manheim Authority, 93 F.Supp. 437 [E.D.Pa., 1950] the Court held:

> "There is no bar to the plaintiff's recovery on the basis of governmental immunity. No statute has been called to my attention which exempts the Authority's property from attachment. The Authority is not a governmental sub-division, and even if it were, the construction of a sewage disposal system would be a proprietary [and] not a governmental function."

■ We cannot find that the exemption from security on appeal given a municipal corporation by the Act of 1897 [12 P.S. § 1152], is applicable to this case because:

1. A municipal authority organized under the Municipal Authority Act of 1945 is not a municipal corporation in the sense of that act;

2. The municipal authority here was engaged in a proprietary function where the governmental immunity of municipal corporations have been denied;

3. The public policy for enforcing such immunity is lacking here.

■ The public policy against execution of judgments against a municipal corporation is that the judgment can be enforced by mandamus execution. A tax levying body must provide in its annual budget for the payment of its debts before appropriating money for any other purpose, and must levy taxes for this purpose before enacting the tax levy for its general operating expenses. If it fails to do so it can be compelled by the action of mandamus. Such a procedure is not available here.

■ Therefore, since the judgment is secured by the taxing power of the municipal corporation, the necessity of security on appeal is gone.

Defendant Municipal Authority relies on Fed.R. of Civ.P. 69(a) which directs that the procedure on execution shall be in accordance with the practice and procedure of the state in which the District Court is held.

Under Pennsylvania practice no judgment is entered until post-trial motions are disposed of and then judgment is entered by the direction of the party in whose favor judgment is rendered by the filing of a praecipe with the Prothonotary and payment of the jury fee. In the United States District Court judgment is entered by the Clerk forthwith upon the return of a verdict, Fed.R. of Civ.P. 58. Fed.R. of Civ.P. 62(a) provides an automatic stay of execution for ten days.

Thereafter, under Fed.R. of Civ.P. 62 (b), further stay is only on direction of court and on such conditions for security

as the court deems proper, pending disposition of a motion for new trial.

■■■■ Thus under Pennsylvania practice there is no judgment until after the disposition of the new trial motions, and there being no judgment there can be no execution. Moore v. Quigley, 402 Pa. 636, 168 A.2d 334. But in federal practice the judgment is entered forthwith and pendency of the motion for new trial does not prevent the judgment from becoming final and does not prevent the issuance of execution. Van Huss v. Landsberg, 262 F.Supp. 867 [W.D.Mo. 1967].

Under Pennsylvania law, once a judgment is entered it may be enforced by execution, Pa.R.Civ.P. 3101 et seq., 12 P.S.Appendix. and a stay of execution may be obtained by entry of a bond for the amount of the judgment, including probable interest and costs.

Neither does Fed.R. of Civ.P. 62(f) aid us. That provision allows a stay of execution in any state where a judgment is a lien on property of a debtor and in which the debtor is entitled to a stay of execution. Under Pennsylvania law, 12 P.S. § 861, makes a judgment on a jury verdict a lien on real estate only. It is not a lien on personal property without attachment. Van Huss v. Landsberg, *supra,* decided the question under a very similar Missouri statute. It has not been shown in this case that defendant Authority has sufficient real estate to secure this judgment, except for some sewer pipe laid in Township rights-of-way and some small pumping stations. What plaintiff seeks to attach and execute upon here is personalty and personal property that appears easy to remove from the reach of Plaintiff by simple requisition of the Defendant Authority.

Defendant Authority and the Intervenors contend that the funds of the Authority in the hands of its Trustee are trust funds, pledged to the Trustee as security for the bondholders under its Trust Indenture for the payment of bondholders.

First, the pledge of all moneys of the Authority to the Trustee is subject to the obligation of the Authority to pay for construction out of such fund, and the execution which plaintiff seeks is that part of its judgment which the verdict established as due from the Authority to Plaintiff on account of its construction contract. Thus, the lien of bondholders in moneys in the Construction Fund held by the Trustee under Sec. 5.02 of its Trust Indenture is subject to the prior claim of construction obligations. The Authority itself has freely drawn on this Construction Fund without the consent of the Bondholders, even for remotely related construction purposes when no actual construction was underway. This illustrates the illusory nature of the bondholders' lien on this fund. This fund has been depleted before this judgment.

A second source of execution which Plaintiff seeks is the Bond Redemption and Improvement Fund created under Sec. 7.06 of the Trust Indenture. This fund may be roughly characterized as a "spill over" fund which is built up from the surplus of all other secured funds which the Trustee is obligated to maintain for the payment of semi-annual interest obligations, retirement of bonds, and reserves to provide for eventual retirement of all bonds. It is composed of the unexpended amounts left in the Construction Fund after the completion of all construction, and excess rental revenues not needed to meet the obligations of the other funds. Sec. 7.06 (p. 86) provides that these moneys may be used by the Authority, upon their resolution and requisition, to a variety of purposes, including costs of construction, costs of construction of capital additions, or the purchase of its own bonds, or the redemption of bonds.

The evidence taken in aid of execution has shown that the Authority has freely used moneys from the Bond Redemption Fund for a variety of purposes; that the Trustee pays the requisitions of the Authority upon said fund

without question or inquiry; and no consent of bondholders is ever required.

In Berlanti v. Borough of Manheim Authority, 93 F.Supp. 437 [E.D.Pa. 1950], a Federal District Court sitting in Pennsylvania was dealing with a similar Pennsylvania municipal authority. The plaintiff was a contractor who had recovered judgment for a balance due under his construction contract. He attached the defendant's funds in possession of a Trustee bank and had the bank brought in as garnishee. The Court held that all moneys derived from the sale of bonds, regardless of the fund to which they were subsequently transferred for the payment or protection of bondholders were nevertheless subject to the claims of construction contractors because the bondholders had purchased their bonds with the knowledge that such moneys were to be used for the payment of construction costs and that the bondholders' lien was subject to the prior application of such moneys for construction. The Court held in that case that money from rental income was not subject to attachment because the Indenture provided that such income was to be used only for payment of interest and principal on bonds. The situation is different in the present case because the present Indenture does not restrict the Authority on the use of surplus rental income after the requirements of the Revenue Fund, the Debt Service Fund, and the Maintenance Reserve Fund have been met.

■ Defendants and Intervenors argue that the Bondholders are secured by a recorded Financing Statement filed under Sec. 9–201 et seq. of the Pennsylvania Uniform Commercial Code, which pledged to the Trustee all the proceeds of the sale of the bonds as well as all receipts and revenues of the Authority. But we do not believe that the rights of the Trustee under the Uniform Commercial Code can rise any higher than the Trust Indenture provides. To the extent that the Authority is free to call upon the Trustee to disburse funds of the Bond Redemption and Improvement Fund, then the collateral secured by the Financing Statement is subject to attachment, levy, garnishment and execution. See Sec. 9–311 Pennsylvania Uniform Commercial Code (12A P.S. § 9–311) and Comment 1 thereunder. Also, as noted in Comment 2, " * * * in all security interests the debtor's interest in the collateral remains subject to claims of creditors who take appropriate action * * * ".

■ Thus we find no obstacle created by the Pennsylvania Uniform Commercial Code to execution upon any funds which, under the Trust Indenture, are not required to pay current interest and retire matured bonds, and provide the necessary reserves. The Bond Redemption and Improvement Fund is not required for this purpose, and is subject to disbursement by the Authority until such time as any event, such as default, makes them available to bondholders.

Furthermore, the provisions of the Secured Transactions Article of the Pennsylvania Uniform Commercial Code specifically excludes a lease of real estate or the rents thereunder from its provisions, Sec. 9–104(j) (12A P.S. § 9–104(j)), and the recorded Financing Statement creates no rights in the Trustee with respect thereto other than those created by the Indenture. A substantial portion of the funds now held in the Bond Redemption and Improvement Fund may have originated from the annual rental payments made by the Township to the Authority under the provisions of the "Contract and Lease" whereby the entire system of the Authority is leased to the Township for operation.

■ Thus, to the extent that any lien of the bondholders to moneys in the Bond Redemption Fund is subject to revocation by act of the debtor, the rights of the Trustee for the bondholders are inferior to the rights of an attaching creditor. See 1 Restatement, Contracts § 172.

Intervenors also argue a general trust fund theory to place the entire funds of the Authority in the hands of the Trustee beyond the reach of creditors. We

do not find the holding of Merritt-Chapman & Scott Corp. v. Public Utility District No. 2, 237 F.Supp. 985 [S.D., N.Y. 1965] controlling. There an attempt was made to bring foreign attachment against the trust fund prior to any determination of plaintiff's right to recover. In our case plaintiff has obtained judgment against the debtor. Secondly, the debtor was found to have no right or interest in the fund which it could assign, release or alienate, either present or reversionary. In our case the moneys in the Bond Redemption and Improvement Fund are subject to withdrawal by the judgment debtor for construction purposes. *Merritt-Chapman & Scott Corp.*, supra, applied New York law. In Pennsylvania it has been held that funds of a municipal authority were subject to attachment. Central Contracting Company v. C. E. Youngdahl & Co., 418 Pa. 122, 209 A.2d 810 [1965].

The only remaining argument raised is that to allow execution to be carried out will imperil the Authority in the event it secures a reversal of the present judgment. This is a risk that every litigant faces, but in this case the sums which Plaintiff is attempting to secure on execution are those mostly admittedly due under the contract. Defendant Authority's only desire is to retain these funds as a credit under its Counterclaim against the Authority, which was denied by the jury's verdict. In the event Authority should finally prevail on its Counterclaim it is well secured by the solvent corporate surety company which it has joined under its Counterclaim.

Also, counsel for intervening bondholders have argued the possible adverse effect on municipal borrowing rates of any invasion of the trust funds. This is not impressive when we examine the evidence produced in aid of execution. It reveals that the Authority has exercised a rather free hand in disposing of almost all of the monies in the Construction Fund, more than $100,000 during a period when no construction was underway, and has also paid out substantial sums from the Bond Improvement and Redemption Fund to various parties other than bondholders, and also when no construction was underway. It appears that the bondholders clearly contemplated under the Indenture that their security rested in the provisions for a Revenue Fund, a Debt Service Fund, a Debt Service Reserve Fund, and a Maintenance Reserve Fund. After the requirements of these funds had been filled, excess revenues were allowed to spill over into the Bond Redemption and Improvement, which was subject to a rather wide power of alienation or disposition by the Authority, which the Authority has widely used, without objection from the Trustee or the bondholders.

As has been frankly admitted by one Intervenor, Provident National Bank, a bondholder:

"However, in the case of the bond redemption and improvement fund, unlike other funds, the Authority is permitted to use the fund to pay construction costs. Consequently, Provident concedes that plaintiff can reach this fund to the extent (and only to the extent) that plaintiff's judgment represents unpaid construction costs. There is no warrant for using this fund to pay damages on lost profits."

The verdict against the Authority alone, based on the Construction Contract itself, was in the amount of $254,-367.04. The evidence showed that this was composed of the following items of claim:

$184,986.25—representing the 10% retainage under the contract, liability for which it is undisputed;

21,838.83—representing approved Estimate No. 19—liability for which is undisputed;

47,541.96—claimed for crushed stone used under the contract, part of which the Authority admitted to be due.

All of these items are bonafide construction costs which no party denies are

**928**

properly payable from the Bond Redemption and Improvement Fund.

 We will, therefore, modify the stay of execution previously granted to the extent of allowing plaintiff to proceed with his execution on funds in the hands of Security-Peoples Trust Company, Trustee, to the extent of $250,000 held by said Trustee in the Bond Redemption and Improvement Fund, unless defendant Authority shall post security in this amount for further stay of execution pending disposition of its motions for new trial and judgment N.O.V.

 We feel that the federal policy is as stated in Van Huss v. Landsberg, 262 F.Supp. 867:

"Rule 62, taken in its entirety, indicates a policy against any unsecured stay of execution after the expiration of the time for filing a motion for new trial."